<u>**NOT FOR PUBLICATION**</u>

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| ROXANN DOMINGUEZ,<br><br>                 Plaintiff,<br><br>v.<br><br>NOVO NORDISK INC., *et al.*,<br><br>                 Defendants. | Civil Action No. 24-11006 (MAS) (JBD)<br><br>**MEMORANDUM OPINION** |

<u>**SHIPP, District Judge**</u>

This matter comes before the Court on Defendants Novo Nordisk Inc. ("Novo"), Kenneth Paul Chambless ("Chambless"), Steve Albers ("Albers"), and Doug Langa's ("Langa") (collectively, "Defendants") Partial Motion to Dismiss Count Nine of Plaintiff Roxann Dominguez's ("Plaintiff") First Amended Complaint ("FAC") (ECF No. 10)[1] as to Albers and Langa (ECF No. 14). Plaintiff opposed (ECF No. 17), and Defendants replied (ECF No. 18). The Court has carefully considered the parties' submissions and decides the matter without oral argument pursuant to Local Civil Rule 78.1. For the reasons stated below, the Court denies Defendants' Partial Motion to Dismiss.

---

[1] Plaintiff filed the FAC four times on the docket. (*See* ECF Nos. 10, 11, 12, 13.) For the purposes of this Memorandum Opinion, the Court considers ECF No. 10 as the operative amended complaint.

I.  **BACKGROUND**[2]

    A.  **Factual Background**

Plaintiff, a Hispanic woman, was hired as a Regional Account Executive by Novo in or about April of 2021. (FAC ¶¶ 31, 33, ECF No. 10.) In August 2022, Plaintiff was promoted to "Director – National Accounts Strategic Planning." (*Id.* ¶ 35.) Plaintiff lived in Texas and traveled to New Jersey for in-person work during the time she was employed at Novo. (*Id.* ¶¶ 1, 36, 49.) Plaintiff planned to move to New Jersey at the one-year mark of her tenure but never did. (*See id.* ¶¶ 37, 195.)

Novo's Executive Management is "responsible for the day-to-day management of the company, development and implementation of strategies and policies, [and] the company's operations and organization." (*Id.* ¶¶ 17-18.) Chambless is the Vice President of National Accounts, Market Access and Public Affairs and was Plaintiff's direct supervisor from August of 2022 through August of 2024. (*Id.* ¶¶ 4, 35.) Albers is Senior Vice President of Market Access and Public Affairs and is Chambless's direct supervisor. (*Id.* ¶ 5.) Langa is Head of North American Operations and the President of Novo. (*Id.* ¶ 6.) He is also the former Head of Market Access and Public Affairs. (*Id.*) In Langa's former position, Albers and Chambless reported directly to Langa and the three of them developed an "extremely close relationship." (*Id.* ¶¶ 23-24.) Plaintiff alleges that Langa, Albers, and Chambless were all part of what is well known at Novo as the "good ole boys' network." (*Id.* ¶¶ 25-26.) Novo's business practice and procedure is such that the Executive Team, including Langa, personally evaluated the employees preliminarily selected for termination and made the ultimate decisions regarding lay-offs and terminations. (*Id.* ¶ 29.)

---

[2] For the purpose of considering the instant motion, the Court accepts all factual allegations in the FAC as true. *See Phillips v. County of Allegheny*, 515 F.3d 224, 228 (3d Cir. 2008).

During the beginning of her tenure, Plaintiff received good evaluations, maximum bonuses, and was identified as "top talent" at Novo. (*Id.* ¶ 34.) Then, at a team meeting in December 2022, a male Director became belligerent towards a female Director on the team over a disagreement about a report evaluating another employee, screaming at her and calling her a "bitch" under his breath. (*Id.* ¶¶ 39-40.) During this exchange, Chambless did not intervene on the female Director's behalf. (*Id.* ¶¶ 41.) Plaintiff, and the only other female on the team, Senior Director, Gretchen Peters ("Peters"), however, objected and spoke up on the female Director's behalf. (*Id.* ¶ 42.) Plaintiff later raised these objections directly to Chambless. (*Id.* ¶ 43.) During this conversation, Plaintiff told Chambless that she agreed with the female Director about the report evaluating the employee because she had witnessed the employee make derogatory comments about homosexuality to a large table of Novo employees. (*Id.* ¶ 45.) Plaintiff also raised her concerns that such "unprofessional, discriminatory, workplace harassment was not psychologically safe for herself or the other females at Novo[.]" (*Id.* ¶ 47.) Chambless offered to report both the homophobic comments and the discriminatory treatment of women to Novo's Human Resources Department ("HR"). (*Id.* ¶ 46.) Chambless did not report either. (*Id.* ¶ 48.)

In January 2023, Novo changed its in person work requirements and required employees to work from the office three times a week, so Plaintiff began to travel to New Jersey more frequently. (*Id.* ¶ 49.) In February 2023, Chambless's team, including Plaintiff attended a retreat in Park City, Utah. (*Id.* ¶ 53.) During the retreat, Chambless demonstrated aggression, hostility, and anger towards Peters, after she expressed a different opinion from him. (*Id.* ¶ 55.) The following week, while in the New Jersey office, Plaintiff approached Chambless and objected to the "derogatory and discriminatory treatment of [Peters]." (*Id.* ¶ 56.) Chambless responded to this objection in a threatening tone stating, "[D]on't worry though, [Peters] will get what is coming to

3

her[,]" and that Plaintiff was not who he thought she was. (*Id.* ¶¶ 58-59.) Shortly thereafter, Chambless publicly demoted Peters. (*Id.* ¶ 60.) The decision to demote her was approved and supported by Albers. (*Id.* ¶¶ 61, 154.) In retaliation for Plaintiff's outspoken support of Peters, Chambless restricted Plaintiff's travel to New Jersey. (*Id.* ¶ 62.)

Plaintiff and Chambless thereafter discussed the logistics of in-office work related to this travel restriction. (*Id.* ¶ 64.) During the conversation, Plaintiff pointed out that two of her male peers resided in other states and required travel as well, and she questioned why they were not being required to move. (*Id.* ¶ 65.) Chambless responded that "they [the men] are just different . . . they have families to take care of." (*Id.* ¶ 66 (alteration in original).) Plaintiff responded that she too had a family, and Chambless answered again that "they are just different." (*Id.* ¶ 67.) Weeks later, Plaintiff had a conversation with Bill Thompson ("Thompson") of HR. (*Id.* ¶ 69.) During the conversation, Plaintiff mentioned that no one had questioned her or anyone else about the incident at the team meeting or the derogatory homophobic comments and asked about whether the investigation was ongoing. (*Id.* ¶¶ 69, 72-73.) Thompson was surprised to hear of the incident and was unable to offer details on the progress of the investigation. (*Id.* ¶ 74.)

A few weeks later, Plaintiff found out she needed unexpected surgery requiring her to be out of work for a month. (*Id.* ¶ 75.) Chambless was upset that he was not advised sooner. (*Id.* ¶ 76.) Before Plaintiff's medical leave, Chambless assigned Plaintiff a "lengthy and impossible list of tasks to be prepared for the next several months." (*Id.* ¶ 77.) Plaintiff also worked on a large project, and right before she was able to present it, Chambless removed her from her speaking role and instead had her train two male members of the team to present it. (*Id.* ¶ 78.) When Plaintiff questioned Chambless about this, he said that those team members needed more "visibility," and

that Plaintiff would get her turn. (*Id.* ¶ 79.) One of those male team members was later promoted. (*Id.* ¶ 80.)

In May of 2023, there was an important conference in Las Vegas that many of the team leadership typically attended to meet with their customers at a resort, but that year, Chambless decided to limit attendance to people who "needed the visibility." (*Id.* ¶¶ 82-84.) Chambless asked the women leaders to "set up" the important meetings but then disinvited them from attending, so only the men attended the conference. (*Id.* ¶¶ 84-85.) In response, Plaintiff strongly voiced her objection to the women not being permitted to attend directly to Chambless, who grew angry. (*Id.* ¶¶ 87-89.) Two leadership roles opened thereafter, and the women team members were discouraged from applying because they lacked "visibility." (*Id.* ¶ 93.)

In June of 2023, Plaintiff, applied for a new position that she had discussed with Chambless in the past, and that other Novo stakeholders encouraged her to apply for. (*Id.* ¶¶ 95-97.) When Chambless found out that she applied, he became furious that she had not consulted him first and claimed that because she was in her current role for under a year, her application was against HR rules. (*Id.* ¶¶ 98-99.) Under the HR rules, the decision of whether she could apply or not was within Chambless's discretion. (*Id.* ¶ 100.) Chambless emailed Plaintiff informing her that he would not allow her to apply for the new role. (*Id.* ¶ 103.) Also in the email, Chambless "stated that the hiring manager mentioned to him that Plaintiff had a child with a disability, . . . and . . . stated that Plaintiff should do what is 'best for' herself and her 'family,'" and reiterated an "earlier conversation where" he stated "'what kind of mother are you, not putting your child first.'" (*Id.* ¶ 104.) Plaintiff emailed Chambless back and Chambless responded, noting that because Plaintiff was applying before her one-year anniversary in her current position, it was his decision and again reiterated that she "should be putting her family first." (*Id.* ¶ 108.)

5

A week later, they discussed the issue in a one-on-one call where Chambless insulted Plaintiff and her worth at the company and as a mother. (*Id.* ¶ 114.) Plaintiff and Chambless had many other one-on-one conversations where Chambless made comments, including: telling Plaintiff that her "strengths" were more "administrative in nature" and she should consider more administrative and project management roles, "much like other women in the organization"; belittling Plaintiff and telling her that the position she wanted to apply for was not the kind of job "a good mother might want" and that he would help her identify more project management roles which are "better for mothers"; emailing Plaintiff and telling her she should "do what is best for [her] family"; asking Plaintiff "what kind of mother are you? Do you even love your kids?"; telling Plaintiff that she was "lazy," "not very smart or strategic," and "an embarrassment"; and telling Plaintiff that "people [don't] like you and see you as 'lazy.'" (*Id.* ¶¶ 136-37, 163.)

Plaintiff later came up with the idea of and created a "cheat sheet" to track what payers were doing with Novo products which was well received. (*Id.* ¶ 138.) Chambless first called this work "trash," but afterwards received positive feedback from others who wanted the project to be completed immediately. (*Id.* ¶ 139-40.) Then he instructed Plaintiff to work on it with a male colleague who he said, "was going to help make the whole project better." (*Id.* ¶ 141.) The colleague made minimal changes to the project, but Chambless referred to it as the "[male colleague's] project" and would not allow Plaintiff to receive credit for the project's creation. (*Id.* ¶¶ 142-44.)

Chambless's conduct was reported to Novo, Albers, and Langa, but they allowed the conduct to continue. (*Id.* ¶¶ 146-47.) Plaintiff also emailed the Vice President of HR and requested a discussion regarding Chambless's conduct in late June of 2023. (*Id.* ¶ 172.) After Plaintiff

reported Chambless's behavior to HR, Chambless's mistreatment of Plaintiff increased. (*Id.* ¶¶ 172-80.)

Sometime between July and September of 2023 there was an additional team meeting in Arizona that was centered around pricing and rebate strategic discussions. (*Id.* ¶¶ 181-82.) Another team member coordinated the meeting and placed Plaintiff on the planning invites to help plan the meeting. (*Id.* ¶ 183.) Chambless requested that Plaintiff be taken off the invites and took control of them to make sure that Plaintiff was not included. (*Id.* ¶ 185.) Plaintiff was the only person on the team uninvited. (*Id.* ¶ 187.) Although other members of the Team advised her to attend, for months leading up to the meeting Chambless told Plaintiff that she could not attend. (*Id.* ¶¶ 189-90.) In response to Plaintiff's protests, Chambless insisted on another one-on-one meeting where he was hostile, aggressive, and belligerent, and claimed that Plaintiff was plotting against him. (*Id.* ¶¶ 192-94.)

Eventually, Thompson from HR called Plaintiff to discuss the issue of Chambless's conduct. (*Id.* ¶ 200.) Plaintiff informed Thompson about Chambless's "sexist comments and animus[,]" that "she was constantly and unrelentingly bullied and threated by . . . Chambless," and that Chambless had "increased the intensity of his antagonistic, hostile behavior." (*Id.* ¶ 201.)

Chambless subsequently had the female team members set up meetings for another "customer meeting" but then limited the women's attendance due to "lack of badges." (*Id.* ¶¶ 204-05.) Chambless, however, ensured that male team members attended because "they needed the visibility." (*Id.* ¶ 207.) After this meeting, when female team members applied for internal jobs, Chambless said that they "'lacked the visibility' they needed." (*Id.* ¶ 209.) Langa and Albers were made aware of Chambless's treatment of women and affirmatively approved of the male team

members being selected for attendance at meetings that women were excluded from and the subsequent promotions of those male team members. (*See id.* ¶¶ 208-11, 288.)

Novo also conducts an annual employee satisfaction survey called the "Evolve Survey." (*Id.* ¶ 115.) During the time period that many of the described interactions between Chambless and Plaintiff took place, the annual survey was conducted. (*Id.* ¶ 116.) Albers and Langa actively participated in the Evolve Survey process. (*Id.* ¶¶ 125-26.) Chambless specifically informed Plaintiff that the protocol for reviewing the Evolve Survey results was that the results were initially sent to Albers for his review. (*Id.* ¶ 128.) The results were then forwarded to Langa who kept them in a binder on his desk and used them to make decisions adjusting Novo's culture. (*Id.* ¶¶ 128-29.) The survey results were extremely negative regarding Chambless and the National Accounts Market Access Team that he led, but Albers and Langa made no changes based on them. (*See id.* ¶ 130.) Team-wide observations and "discussions surrounding th[e Survey] were specifically focused on . . . Chambless'[s] retaliatory treatment of women on the team." (*Id.* ¶ 117-18.)

Plaintiff met with Novo's Equal Employment Opportunity ("EEO") investigator in October of 2023 to discuss her complaints about Chambless's behavior. (*Id.* ¶ 213.) The investigator "stated that Plaintiff's claims had been 'substantiated' and that he was 'elevating' his findings to his [s]upervisor[.]" (*Id.* ¶ 214.) The EEO investigator also told Plaintiff that "when he interviewed some of the witnesses, they were 'afraid,' which left him with a 'chilling effect.'" (*Id.* ¶ 216.) The investigator also explained to Plaintiff that "when people are that afraid you know there is something there, and that sometimes not speaking speaks volumes[,]" and that "of course you know there are others (females) and this is not the first time it has happened." (*Id.* ¶¶ 217-18.) After this meeting, several team members reached out to Plaintiff and informed her that she was

8

not the first female that Chambless "ha[d] done this to, and that such behavior was a pattern[.]" (*Id.* ¶ 221.)

In November of 2023, Plaintiff filed a charge with the Equal Opportunity Employment Commission ("EEOC") alleging that she had been the subject of discrimination, retaliation, and harassment/hostile work environment. (*Id.* ¶ 238.) Weeks later, things escalated when Chambless targeted Plaintiff's job responsibilities, took them away one by one, and excluded her from important meetings. (*Id.* ¶¶ 248-49.) Chambless continued to request one-on-one meetings with Plaintiff, who continued to respond that she did not feel safe or comfortable meeting alone, and in response, Chambless "repeatedly informed Plaintiff that 'it had been decided that she must attend[].'" (*Id.* ¶¶ 250-52.) During these meetings, Chambless demeaned and belittled Plaintiff. (*Id.* ¶ 253.) Plaintiff's repeated requests to have a team member present during these meetings were denied, and she was mocked for claiming that she felt unsafe. (*Id.* ¶¶ 260-61.) Albers and Langa were consulted about Plaintiff's requests to have a third-party present during her meetings with Chambless, and they approved the decision to refuse those requests. (*Id.* ¶ 236.)

In January of 2024, Plaintiff received correspondence from the EEO investigator stating that "the investigation did not establish a violation of Novo's EEO & Anti-Harassment and/or Anti Retaliation Policies." (*Id.* ¶ 263.) Chambless, thereafter, aggressively sent "veiled emails and engaged in a constant barrage of abusive demands." (*Id.* ¶ 266.)

A month later, Plaintiff took bereavement leave, and while on bereavement leave, received her annual bonus and raise which "were cut in half and significantly less than her prior bonuses and raises at Novo." (*Id.* ¶¶ 268-70.) Albers and Langa's job responsibilities included reviewing and approving the raises and bonuses at Novo and they participated in and approved cutting Plaintiff's bonus and raises in half. (*Id.* ¶¶ 270, 273, 289.)

A few months later, Plaintiff was placed on a medical leave of absence. (*Id.* ¶ 274.) While out on medical leave, Novo eliminated eight Market Access Team positions, including Plaintiff's, as part of a restructuring. (*Id.* ¶¶ 275, 277.) Plaintiff, however, was the only team member who was not placed elsewhere in Novo. (*Id.* ¶ 277.) Albers and Langa approved the decision to terminate Plaintiff and not to grant her interviews for positions she was qualified for at Novo. (*Id.* ¶ 289.)

### B. Procedural Background

Plaintiff filed her initial complaint in this Court in January of 2024. (*See generally* Compl., ECF No. 1.) Plaintiff subsequently filed the operative FAC. (*See generally* FAC.) The FAC includes nine causes of action: sex discrimination against Novo in violation of Title VII of the Civil Rights Act of 1964 ("CRA") (Count One); (2) retaliation against Novo in violation of the CRA (Count Two); racial and national origin discrimination against Novo in violation of the CRA (Count Three); (4) hostile work environment based on sex and race in violation of the CRA (Count Four); (5) sex discrimination against Novo in violation of the New Jersey Law Against Discrimination ("NJLAD") (Count Five); (6) hostile work environment against Novo in violation of NJLAD (Count Six); (7) race and national origin discrimination against Novo in violation of NJLAD (Count Seven); (8) retaliation against Novo in violation of the NJLAD (Count Eight); and (9) aiding and abetting liability against Chambless, Albers, and Langa in violation of the NJLAD (Count Nine). (*Id.* ¶¶ 282-418.)

Defendants filed the instant Partial Motion to Dismiss on April 8, 2025. (Defs.' Mot. to Dismiss, ECF No. 14.) Plaintiff opposed (Pl.'s Opp'n Br., ECF No. 17), and Defendants replied (Defs.' Reply Br., ECF No. 18).

## II.     LEGAL STANDARD

Federal Rule of Civil Procedure 8(a)(2)[3] "requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).

A district court conducts a three-part analysis when considering a motion to dismiss under Rule 12(b)(6). *See Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011). First, the court must identify "the elements a plaintiff must plead to state a claim." *Ashcroft v. Iqbal*, 556 U.S. 662, 675 (2009). Second, the court must identify all of the plaintiff's well-pleaded factual allegations, accept them as true, and "construe the complaint in the light most favorable to the plaintiff." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (citation omitted). The court can discard bare legal conclusions or factually unsupported accusations that merely state the defendant unlawfully harmed the plaintiff. *See Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555). Third, the court must determine whether "the [well-pleaded] facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.'" *Fowler*, 578 F.3d at 211 (quoting *Iqbal*, 556 U.S. at 679). A facially plausible claim "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 210 (quoting *Iqbal*, 556 U.S. at 678). On a Rule 12(b)(6) motion, the "defendant bears the burden of showing that no claim has been presented." *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005) (citing *Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1409 (3d Cir. 1991)).

---

[3] All references hereinafter to "Rule" or "Rules" refer to the Federal Rules of Civil Procedure.

## III. DISCUSSION

Defendants seek to dismiss Count Nine of the FAC, aiding and abetting liability in violation of the NJLAD, against Langa and Albers (*see generally* Defs.' Moving Br., ECF No. 15), and make two arguments in support: (1) the FAC does not sufficiently allege that Langa or Albers were Plaintiff's supervisors; and (2) the FAC fails to sufficiently allege the elements of an aiding and abetting claim under the NJLAD against Langa or Albers (*id.* at 9-22). The Court addresses each argument in turn.

First, Defendants argue that the FAC does not adequately allege that Langa and Albers were Plaintiff's supervisors. (*Id.* at 10-12.) In response, Plaintiff asserts that supervisory liability under the NJLAD does not require that an individual defendant be Plaintiff's direct supervisor and that the FAC sufficiently alleges that Langa and Albers are supervisory employees for purposes of the NJLAD. (Pl.'s Opp'n Br. at 17-21.)

"'[I]ndividual liability for a supervisor for acts of discrimination or for creating or maintaining a hostile environment [pursuant to the NJLAD] can only arise through the "aiding and abetting" mechanism[.]'" *Clayton v. City of Atl. City*, 722 F. Supp. 2d 581, 591 (D.N.J. 2010) (quoting *Cicchetti v. Morris Cnty. Sheriff's Off.*, 947 A.2d 626, 645 (N.J. 2008)). "Only supervisors may be held liable under an aiding and abetting standard as they have 'a duty to act against harassment.'" *Randall v. Rutgers, State Univ. of N.J.*, No. 13-7354, 2014 WL 6386814, at *5 (D.N.J. Nov. 14, 2014) (citations omitted); *see also Mahmoud v. Canon Sols. Am., Inc.*, No. 21-11935, 2021 WL 6197422, at *3 (D.N.J. Dec. 22, 2021) ("'[I]ndividual liability is confined to supervisory employees.'" (quoting *Ross v. Amazon.com, Inc.*, No. 19-1864, 2019 WL 1227112, at *2 (D.N.J. Mar. 14, 2019))). "A supervisory employee 'has the authority to hire, fire, discipline, control employees' wages or control employees' schedules.'" *Id.* (quoting *Herman v. Coastal*

*Corp.*, 791 A.2d 238, 254 (N.J. Super. Ct. App. Div. 2002)). Contrary to Defendants' assertion, a defendant does not have to be a plaintiff's direct supervisor to face individual liability as an aider and abettor pursuant to the NJLAD. *See Wark v. J5 Consulting, LLC*, No. 23-266, 2023 WL 6366731, at *6 (D.N.J. Sept. 29, 2023) (quoting *Cicchetti*, 947 A.2d at 644) ("*Cic[c]hetti* does not dictate that a defendant must be the plaintiff's direct supervisor to face individual liability as an aider and abettor.").

Here, Plaintiff adequately pleads that Langa and Albers were supervisory employees because Plaintiff alleges that they had the authority to make changes in her employment status, including reviewing and approving the raises and bonuses at Novo, and that they did approve the diminution in Plaintiff's compensation. (FAC ¶¶ 20, 29, 273, 289, 399-400.) Plaintiff, moreover, alleges that Langa and Albers were involved in the decision to terminate and not rehire her at Novo. (*Id.* ¶¶ 29-30, 289, 410.) Plaintiff thus adequately pleads that Langa and Albers had the authority to make changes to her compensation, which she alleges they did by cutting her annual bonus and raise in half. (*Id.* ¶¶ 270, 273.) The Court thus finds that Plaintiff has sufficiently alleged that Langa and Albers were supervisory employees for purposes of liability under the NJLAD.

Defendants also argue that Plaintiff's allegations fail to raise a reasonable inference that either Langa or Albers provided knowing and substantial assistance to the alleged misconduct because there are no plausible allegations in the FAC that either of them aided or abetted Chambless. (Defs.' Moving Brief, at 12-13.) Defendants also contend that the FAC does not contain allegations that Plaintiff reported any concern of wrongful conduct to Langa or Albers. (*Id.* at 16-18.)

Aiding and abetting liability under the NJLAD takes two forms: the active form "which requires 'knowing and substantial assistance,' or [the] passive [form] which requires that a

13

'supervisor holds a duty to act against harassment and yet remains deliberately indifferent to its existence.'" *Dickerson v. Wallkill Valley Reg'l High Sch. Bd. of Educ.*, No. 19-8450, 2020 WL 2847757, at *12 (D.N.J. June 1, 2020) (citations omitted). To state a claim of aiding and abetting in discrimination under the active form, a plaintiff must allege that the individual defendant: (1) aided the party performing a wrongful act that causes injury; (2) was generally aware of his role as part of an illegal or tortious activity at the time he provided the assistance; and (3) knowingly and substantially assisted the principal violation. *Cicchetti*, 947 A.2d at 645.

To state a claim under the passive form, a plaintiff must adequately allege that the "supervisor holds a duty to act against harassment and yet remains deliberately indifferent to its existence." *Lopez-Arenas v. Zisa*, No. 10-2668, 2012 WL 933251, at *10 (D.N.J. Mar. 19, 2012) (citing *Hurley v. Atl. City Police Dep't*, 174 F.3d 95, 126 (3d Cir. 1999)). Such "'inaction can form the basis of aiding and abetting liability if it rises to the level of providing substantial assistance or encouragement.'" *Hurley*, 174 F.3d at 126 (quoting *Failla v. City of Passaic*, 146 F.3d 149, 158 n.11 (3d Cir. 1998)). The Third Circuit and the New Jersey Supreme Court have applied five factors from the Restatement (Second) of Torts to determine whether a defendant provides "substantial assistance" to the principal violator: (1) the nature of the act encouraged; (2) the amount of assistance given by the supervisor; (3) whether the supervisor was present at the time of the asserted conduct; (4) the supervisor's relations to the others; and (5) the state of mind of the supervisor. *Tarr v. Ciasulli*, 853 A.2d 921, 929 (N.J. 2004) (citations omitted).

At this stage, Plaintiff "need only allege sufficient facts giving rise to the inference that [Langa and Albers] unlawfully aided and abetted" Chambless and Novo. *Wark*, 2023 WL 6366731, at *6. Based on this standard, the Court finds that Plaintiff has alleged sufficient facts at the pleading stage. Plaintiff alleges that: Langa and Albers were directly involved in both the decisions

14

to cut her pay and to eliminate her position and not interview her for other positions that she was qualified for; they both approved the decision to refuse her requests to have a third-party present during her meetings with Chambless; they approved the decision to have male team members selected for attendance at meetings that women were excluded from; and they approved the subsequent decision to promote the male team members. (*See, e.g.*, FAC ¶¶ 208-11, 270-73, 288-89.) These allegations sufficiently give rise to the inference that Langa and Albers: (1) aided and abetted Chambless and Novo in performing wrongful acts that caused injury by discriminatorily cutting Plaintiff's pay and terminating her position; (2) were generally aware of their role when they did so (because Chambless's actions were reported to them); and (3) provided substantial assistance. *See Cicchetti*, 947 A.2d at 645.

An assessment of the factors for determining whether Langa and Albers provided "substantial assistance" further bolsters the conclusion that Plaintiff has adequately alleged an aiding and abetting claim. *See A.C. v. Dwight-Englewood Sch.*, No. 21-6376, 2022 WL 1184799, at *5-6 (D.N.J. Apr. 21, 2022). First, the nature of the alleged acts encouraged—discrimination and retaliation against Plaintiff—were serious. *See Tarr*, 853 A.2d at 929. Second, the amount of assistance given by the supervisors—approving cuts to Plaintiff's compensation, making decisions excluding women from company events, and denying Plaintiff's requests to have a third-party present during meetings with Chambless—was substantial. *See id.* Third, although Langa and Albers were not present during most of the instances of Chambless's behavior toward Plaintiff, they were alleged to be present for the decision-making regarding Plaintiff's job and salary status. *See id.* Fourth, Plaintiff has alleged that Langa, Albers, and Chambless shared a close relationship and were part of a group well known at Novo as the "good ole boy's network." *See id.* Fifth, nothing specific is pleaded about the state of mind of Langa and Albers. *See id.* Together, these

15

actions meet the substantial assistance threshold for pleading purposes. *See A.C.*, 2022 WL 1184799, at *5-6.

The Court is therefore satisfied that Plaintiff has plausibly pleaded a claim for aiding and abetting liability pursuant to the NJLAD against Langa and Albers.

### IV.  CONCLUSION

For the reasons set forth herein, Defendants' Partial Motion to Dismiss is denied. The Court will issue an Order consistent with this Memorandum Opinion.

Dated: 10/9/2025

/s/ Michael A. Shipp
**MICHAEL A. SHIPP**
**UNITED STATES DISTRICT JUDGE**